TOWN OF MILTON *vs.* MASSACHUSETTS BAY
TRANSPORTATION AUTHORITY.

Suffolk.    October 7, 1969. — December 4, 1969.

Present: WILKINS, C.J., SPALDING, KIRK, SPIEGEL, & REARDON, JJ.

*Massachusetts Bay Transportation Authority. Notice. Words,* "Consultation."

The record in a suit in equity warranted conclusions that the Massachusetts Bay Transportation Authority had duly notified the advisory board that the authority sought its approval of a proposed revision of the authority's master plan for mass transportation, as requested in a letter summarizing the revision personally delivered by the authority's general manager to the board's secretary in compliance with G. L. c. 161A, § 7, on the day preceding a scheduled board meeting at which the revision was presented and adopted after each member present had been handed a copy thereof, and that a town represented on the board had actual notice of the revision and adequate opportunity to prepare the opposition thereto which its representative expressed at that meeting. [470–472]

A proposal of the Massachusetts Bay Transportation Authority to replace its streetcar service on the Mattapan line with "other types of vehicles" did not show that operation of such line thereafter at a deficit would be in violation of G. L. c. 161A, § 5 (d). [472]

A proposal of the Massachusetts Bay Transportation Authority to extend its rapid transit service from Ashmont to Mattapan was not shown to involve a "substantial change in mass transportation service" in that area from the streetcar service currently rendered, and G. L. c. 161A, § 5 (f) was not applicable. [473]

Evidence reported in a suit in equity warranted findings by the trial judge that a proposed revision by the Massachusetts Bay Transportation Authority of its program for mass transportation "was based on the transportation plans and programs adopted" by the Public Works Commission, a vote of which so implied, and that "there were consultations" by the authority with the agencies concerned specified in G. L. c. 161A, § 5 (g), including three discussions of the revision by the authority's general manager with agency personnel. [473–474]

A contention in a suit in equity that the Massachusetts Bay Transportation Authority had not included "comprehensive financial estimates of costs and revenues" as required by G. L. c. 161A, § 5 (g), when it submitted for the advisory board's approval a proposed revision of the authority's master plan for mass transportation by extending rapid transit from Ashmont to Mattapan was not well founded where it

appeared that the revenue of its program would remain constant, that revenue estimates were available in the master plan, and that cost estimates were annexed to the revision submitted and "a cost analysis was fully explained" to the board members. [474–475]

In a suit in equity involving a proposed revision of the Massachusetts Bay Transportation Authority's program for mass transportation under G. L. c. 161A, there was no merit in a contention that letters to the authority from the Governor of the Commonwealth and from the executive director of the Metropolitan area planning council were improperly admitted in evidence because written after the commencement of the suit. [475]

BILL IN EQUITY filed in the Superior Court on March 15, 1968.

The suit was heard by *Tomasello, J.*

*Robert D. O'Leary,* Town Counsel, for the plaintiff.

*William D. Quigley (Bruce H. Segal* with him) for the defendant.

SPIEGEL, J. This bill in equity brought by the town of Milton (town) for declaratory relief under G. L. c. 231A seeks to "determine the powers of the . . . [Massachusetts Bay Transportation Authority (Authority)] with respect to the proposed rapid transit extension from Ashmont to Mattapan." The trial judge made "Rulings and Order for Decree," and filed a "Report of Material Facts." The town appealed from a final decree which, inter alia, dismissed the bill.[1] The evidence is reported.

We summarize the findings of the judge. On or about

---

[1] The final decree reads as follows: "1. That the program of the . . . [defendant] for the extension of rapid transit to Mattapan was based upon transportation plans and programs adopted by the public works commission pursuant to Section 3A of Chapter 16 of the General Laws and was prepared in consultation with the department of commerce and development, the metropolitan area planning council and such other agencies of the Commonwealth or of the federal government as were concerned with the program as required by Chapter 161A, Section 5 (g) of the General Laws. 2. That the aforesaid program was duly approved by the advisory board of the Massachusetts Bay Transportation Authority on February 29, 1968. 3. That within thirty days following such approval the metropolitan area planning council advised the . . . [defendant] in writing that the program was not based on the transportation plans and programs adopted by the public works commission. 4. That the program was thereafter duly approved by the Governor of the Commonwealth as required by Chapter 161A, Section 5 (g) of the General Laws. 5. That the . . . [defendant] has legally complied with Chapter 161A of the General Laws and its action is valid. 6. That the . . . [defendant] has not acted arbitrarily, capriciously or whimsically in promoting and furthering its program. 7. That the matter in issue is administrative in scope. 8. That the . . . [plaintiff's] Bill of Complaint is to be dismissed."

August 17, 1966, the general manager of the Authority, "a body politic and corporate and a political subdivision of the commonwealth,"[2] operating various transit systems in the Metropolitan Boston area, submitted a preliminary proposal for expansion of its rapid transit lines to its advisory board (board) which consists of representatives of seventy-nine participating cities and towns. This program was approved on September 15, 1966. A staff supplementary report was also submitted in 1966. On or about February 28, 1968, the Authority submitted to the board a proposed revision of the master plan "at which time the . . . Board was duly notified that the . . . Authority sought its approval." "[T]he decision of the . . . Authority to advance its proposal of expansion was arrived at after consultations with the agencies required by General Laws Chapter 161A. Included in these consultations were the Public Works Commission, the Department of Commerce and Development, and the Metropolitan Area Planning Council."

On February 29, 1968, at a meeting of the board attended by thirty-nine of the seventy-nine board members, "the proposal was fully discussed . . . and 37 of those present voted affirmatively for the proposal."[3] At this time, the board was also informed that additional land would be required at the Mattapan location. Of those members present at the board meeting "the . . . [representative of the] Town and another member were the only . . . [ones] voicing and voting in opposition to the proposal." "[T]he proposed expansion and the plan to relocate the yards of the . . . Authority at the Mattapan terminus was a matter of wide common knowledge . . . [and] prior to February 15, 1968, the . . . Town . . . [was] advised of the proposed . . . relocation." Those members of the board voting in the affirmative were sufficient in number to assure the "ap-

---

[2] G. L. c. 161A, § 2, inserted by St. 1964, c. 563, § 18.

[3] Under the method set out by G. L. c. 161A, § 7, the total weight vote of the board is 195.00. The weighted vote of those board members voting affirmatively for the revision was 152.4501. Those voting against the revision, the representatives of the town and Randolph, had a weighted vote of only 2.9182.

proval of the proposal according to the By-laws of the Advisory Board."[4]

. After the board's approval, the proposal was submitted to and approved by the board of directors of the Authority. Within thirty days after the board's approval of the master plan revision "the Metropolitan Area Planning Council advised the . . . Authority in writing that the program was not based on the transportation plans and programs adopted by the Public Works Commission." On or about August 16, 1968, the program was approved by the Governor of the Commonwealth.

The town contends that the judge's finding that "'the . . . Board was *duly* notified that the . . . Authority sought its approval [of the revised master plan]' is not warranted on the evidence." However, the record does not support this contention. On February 20, 1968, in conformity with the by-laws of the board, the acting chairman, Lincoln P. Cole, Jr. (chairman) gave the board membership notice of a meeting scheduled for February 29, 1968. He informed the membership that the purpose of the meeting would be to act upon certain supplementary budgets of the Authority, to elect board officers and executive committee members, and to consider "any other matter which may properly come before the . . . Board." On February 29, 1968, a copy of the proposed revision (revision), submitted for board approval by Authority General Manager, Leo J. Cusick, was handed to each board member as he entered the meeting room. One of the board members made a motion to approve the revision and the motion was seconded. The chairman then requested Cusick to explain the major features of the revision. Following Cusick's explanation, the town's representative voiced its opposition to the Authority's revision and engaged in a lengthy analysis of the revision's lack of merit, the difficulties that would arise and the unnecessary expense that would be incurred in implementing that revision. The town's representative then moved to have the

---

[4] See G. L. c. 161A, § 7.

revision referred to the board's development committee for further study and a report to the board within thirty days. The chairman ruled this motion out of order, since a prior motion was before the board and had not yet been resolved. The town's representative took no appeal from the chairman's ruling.

At no time did the town object to lack of proper notice or state that it had insufficient opportunity to prepare its objections to the revision. In fact, we are unable to discern any basis for such an objection. The town was fully aware of the proposed revision and had met with Cusick on two previous occasions to discuss the revision. The town demonstrated its preparation in opposition to the revision in a letter of its selectmen to Cusick dated February 5, 1968, and at the board meeting when its representative cited several instances where the Authority allegedly had not complied with the requirements of G. L. c. 161A, § 5, in preparing the revision for board approval.

The purpose of notice is to inform the party in interest with reasonable particularity of the proposed action so that he can reasonably prepare his arguments. *Manchester* v. *Selectmen of Nantucket,* 335 Mass. 156, 158–159. See *Rousseau* v. *Building Inspector of Framingham,* 349 Mass. 31, 37. The record plainly discloses that the town had both actual notice of the revision and an opportunity to argue against the adoption of the revision.

In any event, the sole statutory provision requiring the Authority to give notice in its dealings with the board is G. L. c. 161A, § 7, which reads as follows: "Any notice or submission hereunder to the advisory board or to the sixty-four cities and towns or to the fourteen cities and towns shall be given in such manner as the governor or authority deems reasonable." Cusick, on behalf of the Authority, complied with this provision on February 28, 1968, by personally delivering to the board secretary, Paul E. McBride, a letter which contained a summary of the Authority's revision and a request for the board's approval thereof. The means by which the board subsequently gave its members notice that

the revision would be on the agenda for February 29, 1968, was not the concern of the Authority. Any defect in the board's notice to its members should not be imputed to the Authority. Such defect does not render the Authority's notice to the board invalid as the plaintiff maintains.

Since the agenda for the board meeting of February 29, 1968, included the annual election of board officers and executive committee members, the Authority could reasonably believe that the revision would reach the hands of all interested and participating board members.

The town claims that G. L. c. 161A, § 5 (d),[5] permits the Authority to manage the Mattapan line at a deficit only while the line is "equipped with streetcars." The town further asserts that since the revision would require the installation of "other types of vehicles" and Cusick testified that "it is absolutely 'impossible' for his proposed line to operate other than at a deficit," this court is afforded ample ground for "strik[ing] down" the revision. We note, however, that § 5 (d) does not absolutely prohibit the Authority from operating its express service at a deficit no matter what type of vehicle is in use, but rather requires that the Authority attempt, "so far as practicable," to operate its facilities profitably. Moreover, Cusick did not testify that it would never be possible to operate the Mattapan line at a profit. His testimony was only in response to a question asking whether he had any doubt "at the present time" that under the revision the Mattapan line would operate at a deficit. He had previously denied the assertion that he "undertook . . . [the revision] without there being any possibility in the world that this new proposed line would operate other than at a deficit." We find no violation of § 5 (d).

---

[5] "Excluding any loss suffered in the operation of commuter railroad service and the Highland Branch and Mattapan high speed services while operated and equipped with streetcars, the authority shall operate its express service, so far as practicable, in such a manner that no net cost of service exclusive of debt service shall arise on account of such express service in any year. In addition the authority shall operate all its services in such manner as to produce the highest return consistent with the authority's obligations under subsection (a)."

356 Mass. 467                                                    473

Milton v. Massachusetts Bay Transportation Authority.

The town also maintains that the Authority violated G. L. c. 161A, § 5 (f),[6] because it had not given the board thirty days notice of a "substantial change in mass transportation service in the area constituting the authority." However, we can find no evidence to support the town's contention that there "will be a substantial change in the service" on the Mattapan line.

The town further contends that the rulings of the judge, "that the . . . [revision] was based on the transportation plans and programs adopted by the public works commission and that there were consultations by the . . . [Authority] with the Department of Commerce and Development, the Metropolitan Area Planning Council and such other agencies . . . as were concerned with the program as required by . . . [G. L. c.] 161A, section 5 (g),"[7] were not warranted by the evidence. We do not agree.

In determining whether the revision was based on the transportation plans and programs adopted by the Public Works Commission, the judge was justified in relying on the vote of that commission which implied that it believed the revision was based on its required plans and programs.

The town in its attempt to show that the Authority has not satisfied the consultation requirements of § 5 (g) con-

---

[6] "No substantial change in mass transportation service in the area constituting the authority shall be made unless notice thereof shall have been given to the advisory board at least thirty days prior to the change."

[7] "The authority shall prepare and from time to time revise its program for mass transportation within the area constituting the authority. Such program shall be based upon transportation plans and programs adopted by the public works commission pursuant to section three A of chapter sixteen, shall be prepared in consultation with the department of commerce and development, the metropolitan area planning council, and such other agencies of the commonwealth or of the federal government as may be concerned with the said program, and shall be subject to the approval of the advisory board; provided, however, that if within thirty days following such approval any such agency shall advise the authority in writing that the program is not based on the transportation plans and programs adopted by the said commission, the program shall be subject to the approval of the governor. The said program shall include a long-range plan for the construction, reconstruction or alteration of facilities for mass transportation within the area constituting the authority together with a schedule for the implementation of such construction plan and comprehensive financial estimates of costs and revenues, and shall, so far as practicable, meet the criteria established by any federal law authorizing federal assistance to preserve, maintain, assist, improve, extend or build local, metropolitan or regional mass transportation facilities or systems."

tends that the word "consultation" means to "seek counsel from, to ask advice of, to refer to for information. To consult implies talking over a subject or a situation with someone to decide points in doubt. To consult is to seek from a presumably qualified personal or impersonal source advice, opinion, etc. Finally, . . . to consult is to interchange views in order to throw light on a subject under consideration."

While a word may have more than one meaning we are not compelled to adopt the most restrictive definition. We note, in addition, that Webster's New International Dictionary, 3d ed., Unabridged, p. 490,[8] does not define the word in such restrictive or stringent terms as suggested by the town. The evidence discloses at least two occasions when Cusick discussed the revision with Robert G. Davidson, executive director of the Metropolitan area planning council, and one occasion when Cusick discussed the revision with members of the Department of Commerce and Development. We are of opinion that the judge was correct in finding that the necessary consultations had occurred as required by § 5 (g).

We do not agree with the town's contention that the revision did not comply with the requirement of § 5 (g) that it include "comprehensive financial estimates of costs and revenues." From Cusick's testimony it appeared that the revenue of the Authority's mass transportation program would remain constant, even with the construction of a new Mattapan line as proposed by the revision. The revenue estimates were available in the master plan and no purpose would be served by submitting them with the revision. Additionally, the cost estimates annexed to the revision were sufficient to permit the judge to find that

---

[8] The definitions are as follows: "[C]onsultation" — "1 : a council or conference (as between two or more persons) to consider a special matter . . . 2 : the act of consulting or conferring : deliberation of two or more persons on some matter." "[C]onsult" — "1 obs a : to deliberate on : DISCUSS . . . 2 a : to ask advice of : seek the opinion of . . . 3 : to have prudent regard to : have an eye to : CONSIDER . . . : to take counsel : deliberate together : CONFER."

"a cost analysis was fully explained to the members of the . . . [b]oard," at the February 29, 1968, meeting.

The town's claim that the letters from Governor John A. Volpe and Davidson of the Metropolitan area planning council were improperly admitted in evidence because they were written after the commencement of the suit is without merit.

The final decree is to be modified by striking out the eighth provision dismissing the bill, and as so modified is affirmed with costs of appeal.

*So ordered.*