NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-11778

COGHLIN ELECTRICAL CONTRACTORS, INC. vs.  GILBANE BUILDING COMPANY & another;[1] DIVISION OF CAPITAL ASSET MANAGEMENT AND MAINTENANCE, third-party defendant.

Worcester.     March 2, 2015. - September 2, 2015.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, & Hines, JJ.

Contract, Public works, Construction contract, Delivery, Warranty, Indemnity.  Warranty.  Indemnity.  Public Works, Construction management at risk.

Civil action commenced in the Superior Court Department on July 17, 2013.

A motion to dismiss a third-party complaint was heard by Brian A. Davis, J.

The Supreme Judicial Court granted an application for direct appellate review.

John W. DiNicola, II (Michael Brangwynne with him) for Gilbane Building Company.
James A. Sweeney, Assistant Attorney General, for Division of Capital Asset Management and Maintenance.
The following submitted briefs for amici curiae:

_____

[1] Travelers Casualty & Surety Company of America.

David J. Hatem, Cheryl A. Waterhouse, & Amanda E. Mathieu for American Council of Engineering Companies of Massachusetts & another.

Shannon A. Reilly for Construction Industries of Massachusetts.

Joel Lewin, Robert V. Lizza, Jonathan T. Elder, & Robert T. Ferguson, Jr., for Associated General Contractors of Massachusetts, Inc.

Hugh J. Gorman, III, & Jeffrey J. Pyle for Columbia Construction Company.

GANTS, C.J.  This case requires us to resolve three issues regarding a public construction contract that implements the construction management at risk delivery method, pursuant to G. L. c. 149A:  (1) Does the owner who furnishes the plans and specifications in a public construction management at risk project give an implied warranty of their sufficiency for the purpose intended, as the owner does under our common law in traditional design-bid-build construction projects?  (2) If so, did the parties to the construction management at risk contract in this case disclaim the implied warranty?  (3) If they did not, did the indemnification provision in the contract prohibit the construction manager at risk (CMAR) from filing a third-party complaint against the owner in a case brought by a subcontractor seeking reimbursement of additional costs, thus requiring the CMAR to file a separate complaint against the owner to recover the additional costs caused by an insufficient or defective design under the implied warranty?

We conclude:  (1) under our common law, a public owner of a construction management at risk project gives an implied warranty regarding the designer's plans and specifications, but the scope of liability arising from that implied warranty is more limited than in a design-bid-build project; (2) the construction management at risk contract in this case did not disclaim the implied warranty; and (3) the indemnification provision in the contract did not prohibit the CMAR from filing a third-party complaint against the owner that sought reimbursement under the implied warranty for damages claimed by the subcontractor arising from the insufficiency of or defects in the design.[2]

Background.  The Division of Capital Asset Management and Maintenance (DCAM) is the owner of a construction project to build a psychiatric facility at the site of the Worcester State Hospital (Project).  DCAM entered into a contract with Ellenzweig Associates (Designer) to prepare the Project's designs.  See G. L. c. 7C, § 44 ("Designer" is individual or other entity "engaged in the practice of architecture, landscape architecture, or engineering" and registered in discipline

---

[2] We acknowledge the amicus briefs submitted by American Council of Engineering Companies of Massachusetts and Massachusetts Chapter of the American Institute of Architects; Associated General Contractors of Massachusetts, Inc.; Construction Industries of Massachusetts; and Columbia Construction Company.

required for project).  When the designs were partially completed, DCAM entered into a contract with Gilbane Building Company (Gilbane) as the CMAR.[3]  Gilbane entered into a subcontract with Coghlin Electrical Contractors, Inc. (Coghlin), to perform electrical work.  The subcontract incorporated by reference the terms of the contract between DCAM and Gilbane.

On July 19, 2012, approximately one month before it substantially completed its work, Coghlin submitted to Gilbane a request for equitable adjustment of the contract price.  Nearly one year later, on July 17, 2013, Coghlin filed a complaint in the Superior Court against Gilbane, alleging, inter alia, that Gilbane committed a breach of its subcontract with Coghlin by causing Coghlin to incur additional costs resulting from various scheduling, coordination, management, and design errors.[4]  Gilbane then filed a third-party complaint against DCAM, asserting that, "in the event that Coghlin proves its claims against Gilbane," DCAM committed a breach of its contract with

---

[3] The contract between Gilbane Building Company (Gilbane) and the Division of Capital Asset Management and Maintenance (DCAM) states that Gilbane "is an independent contractor and is not an agent or employee of, or a joint venturer with, DCAM."

[4] Coghlin Electrical Contractors, Inc. (Coghlin), also named Gilbane's surety under a payment bond, Travelers Casualty and Surety Company of America, as a defendant in its complaint.  See G. L. c. 149, § 29.

Gilbane by refusing to pay Gilbane the amounts claimed by Coghlin.

Because DCAM's liability on the third-party complaint is contingent upon Coghlin prevailing on its complaint, we recite the relevant factual allegations in both the complaint and the third-party complaint.[5] In October, 2009, Coghlin began performing electric work on the first of two sets of buildings and, for the first year, was generally able to perform on schedule. However, beginning around November, 2010, various errors, omissions, and changes severely affected Coghlin's performance, causing Coghlin to incur a forty-nine per cent increase in labor hours. Coghlin's increased costs resulted both from Gilbane's alleged mismanagement of the Project, such as its failure to issue monthly schedules and coordinate the

---

[5] The judge declined to convert the motion to dismiss into a motion for summary judgment, so we do not consider the affidavit and the attached correspondence submitted by Gilbane with its opposition to the motion to dismiss as part of the record on appeal, and rest solely on the allegations in the pleadings, as well as the contracts referenced in the pleadings. See Marram v. Kobrick Offshore Fund, Ltd., 442 Mass. 43, 45 n.4 (2004) (where offering memorandum and subscription agreement were not attached to complaint but plaintiff had notice and "relied on them in framing the complaint," attachment of such documents to motion to dismiss did not convert motion to one for summary judgment). See also Sher v. Desmond, 70 Mass. App. Ct. 270, 281 n.14 (2007) (attached correspondence in support of motion to dismiss did not convert motion into summary judgment motion where judge did not give notice to parties "that the judge intended to treat the motion to dismiss as one for summary judgment").

various subcontractors, and from design defects and changes.  As to the design, Coghlin alleged that the ceilings in the project were designed to leave two feet of space between the ceilings and the bottom of the structural steel, but "[w]hen Project work began, it was revealed that the design required approximately five feet of mechanical and electrical work to be placed in the ceiling area."  After six weeks of attempting to resolve the discrepancy, Coghlin was directed to place the electrical work as high as possible in the ceiling, and was told that the Designer and Gilbane would address the issue later.  Coghlin also alleged that, "[w]hen wall framing began, based upon design changes and for other reasons not related to Coghlin's performance, it became evident that the floors would not be framed in a logical and sequential fashion."  In addition, Coghlin alleged that the Designer specified that Coghlin use certain specific electrical fixtures on the Project, but the Designer rejected them when Coghlin filed the product submittals.

In its third-party complaint, Gilbane claims that it performed its work in accordance with the contract, and that DCAM has not paid Gilbane for the amounts sought by Coghlin.  DCAM filed a motion to dismiss the third-party complaint.  After conducting a hearing, the judge allowed the motion and judgment was entered in favor of DCAM.

In his decision, the judge recognized that Gilbane's third-party complaint effectively alleged that DCAM should indemnify Gilbane for "damages caused by design changes and design errors," that were "unrelated to any wrongdoing on Gilbane's part," for which Gilbane may be liable to Coghlin.  The judge, citing J. Lewin & C.E. Schaub, Jr., Construction Law § 7:3, at 452 (2012) (Lewin & Schaub, Jr.), acknowledged that Massachusetts common law "traditionally has been protective of construction contractors in circumstances where the owner has supplied erroneous or, perhaps, ambiguous plans and specifications."  See Lewin & Schaub, Jr., supra at § 7:3, at 464 (2014-2015) ("where a party provides a contractor with a set of plans and specifications for construction to follow, there is an implied warranty that those plans and specifications are adequate and sufficient").  The judge concluded, however, that the implied warranty of the owner applies only where the construction project uses the traditional design-bid-build construction method, in which the owner retains a designer to design the project, construction bids are submitted based on that design, and the general contractor who wins the contract is expected to build the project in accordance with the plans and specifications of the design.  The judge determined that this implied warranty does not apply where, as here, the construction project uses the construction management at risk method, given

the "material changes in the roles and responsibilities voluntarily undertaken by the parties" to such contracts.

The judge also determined that the indemnification provision in the contract between DCAM and Gilbane, which requires Gilbane to indemnify, defend, and hold harmless DCAM from all claims, damages, losses, and expenses "arising out of or resulting from the performance of the Work," as defined in the contract, imposes liability on Gilbane for any damages it might win in its third-party claims against DCAM.  The judge concluded that, because Gilbane effectively is suing itself in its third-party complaint, Gilbane's third-party claims create "an impermissible 'circuity of obligation'" (citation omitted). Gilbane appealed, and we allowed its motion for direct appellate review.

Discussion.  "We review the allowance of a motion to dismiss de novo," accepting as true the facts alleged in the plaintiff's and the third-party plaintiff's complaints as well as any favorable inferences that reasonably can be drawn from them.  Galiastro v. Mortgage Elec. Registration Sys., Inc., 467 Mass. 160, 164 (2014).  To survive a motion to dismiss, the facts alleged and the reasonable inferences drawn therefrom must "plausibly suggest . . . an entitlement to relief."  Flagg v. Alimed, Inc., 466 Mass. 23, 26-27 (2013), quoting Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008).

1. Construction management at risk contracts under G. L.
c. 149A. a. Construction project delivery methods. The
construction management at risk contract at issue in this case
differs from contracts made pursuant to the conventional design-
bid-build method. In a design-bid-build project, "the owner
retains an engineer or an architect on a separate contract to
complete the design of the public facility," and once the design
is complete, the design is made available to potential bidders
and the construction contract is advertised for bid. Associated
Subcontractors of Mass., Inc. v. University of Mass. Bldg.
Auth., 442 Mass. 159, 165 n.8 (2004), quoting D. Gransberg, The
Cost of Inaction: Does Massachusetts Need Public Construction
Reform? at 3 (1999). Contractors submit prices, and the project
is awarded to the "lowest responsive and responsible bidder."
Associated Subcontractors of Mass., Inc., supra, quoting
Gransberg, supra. The construction services contract between
the owner and the contractor allocates to the contractor the
responsibility of "selecting, coordinating, and administrating
the work of all of the various subcontractors." Lewin & Schaub,
Jr., supra at § 2:6, at 14. "[T]he risk of the design is
allocated to the engineer or architect, while the risk of
construction is allocated to the contractor." Id. at 14-15.

On January 1, 2005, § 27 of the "Act further regulating
public construction in the Commonwealth" became effective, see

St. 2004, c. 193, § 27, authorizing public agencies to use two additional delivery methods:  design-build and construction management at risk.  In a design-build project, the owner contracts with a single party that assumes both the design and the construction responsibilities.  See G. L. c. 149A, § 15 ("Design build" defined as "construction delivery system that provides responsibility for the delivery of design services and construction services within a single contract"); Lewin & Schaub, Jr., supra at § 2:6, at 15.  By replacing two entities with one, owners may reduce delays and focus responsibility on a single entity.  See J. Sweet & M.M. Schneier, Legal Aspects of Architecture, Engineering and the Construction Process § 14.09E (9th ed. 2013) (Sweet & Schneier) ("Owners are often frustrated when they look to the designer who claims that the contractor did not follow the design, with the latter claiming that the problem was poor design").  In Massachusetts, a public agency is only authorized to use the design-build method for certain public works projects, not public building projects.  G. L. c. 149A, § 14.

The construction management at risk method is available to public agencies for the "construction, reconstruction, installation, demolition, maintenance or repair of any building estimated to cost not less than [$5 million]."  Id. at § 1. Similar to the design-bid-build method, the owner enters into

separate contracts, one with the designer and one with the CMAR. Id. at § 3 (public agency must procure services of designer, who is "independent of the owner's project manager and [CMAR]," before submitting application to use construction management at risk method). However, in the construction management at risk method, the owner may contract with the CMAR before the design has been completed. Id. at § 7 (total dollar amount for CMAR services is based on design documents "which are no less developed than [sixty] per cent"). See Office of the Inspector General, Experience of Massachusetts Public Agencies with Construction Management at Risk Under M. G. L. c. 149A, at 9 (Oct. 2009) (OIG Report) (CMAR "selected during the design stage of the project"). By contracting during the design phase, the owner may "involve the [CMAR] in project planning and . . . benefit from the [CMAR's] expertise." Lewin & Schaub, Jr., supra at § 17:42, at 1226. See P.L. Bruner & P.J. O'Connor, Jr., On Construction Law, § 6:59 (2002) (Bruner & O'Connor, Jr.) (CMAR "provides preconstruction services tailored to introduce construction expertise into the design phase"). The CMAR provides its services in exchange for a guaranteed maximum price (GMP), representing the maximum amount that the owner will pay. See G. L. c. 149A, § 2; id. at § 7. Absent a change order, the CMAR is generally responsible for any costs that exceed the GMP. See Lewin & Schaub, Jr., supra at § 17:42, at 1227.

b.  Implied warranty of the designer's plans and
specifications.  We now consider whether the owner in a
construction management at risk contract made pursuant to G. L.
c. 149A impliedly warrants the sufficiency of the designer's
plans and specifications.  In design-bid-build projects, "[i]t
is well established that where one party furnishes plans and
specifications for a contractor to follow in a construction job,
and the contractor in good faith relies thereon, the party
furnishing such plans impliedly warrants their sufficiency for
the purpose intended."  Alpert v. Commonwealth, 357 Mass. 306,
320 (1970).  See United States v. Spearin, 248 U.S. 132, 136
(1918) ("if the contractor is bound to build according to plans
and specifications prepared by the owner, the contractor will
not be responsible for the consequences of defects in the plans
and specifications").  See also Richardson Elec. Co. v. Peter
Francese & Son, 21 Mass. App. Ct. 47, 50 (1985) ("There is
implied in a set of construction plans and specifications a
warranty that they are accurate as to descriptions of the kind
and quantity of work required").  This implied warranty between
the owner and the contractor "is a representation that the
design is defect-free," and the contractor "need only show that
the defect exists and that he suffered damages as a result
thereof" in order to recover.  Bruner & O'Connor, Jr., supra at
§ 9:82, at 670, 671 n.5, quoting Harrington, Thum, & Clark, The

Owner's Warranty of the Plans and Specifications for a Construction Project, 14 Pub. Con. L. J. 240, 259-260 (1984). In design-bid-build projects, the implied warranty of the owner "is not overcome by the usual clauses requiring builders to visit the site, to check the plans, and to inform themselves of the requirements of the work." Spearin, supra. However, the implied warranty does not absolve a contractor of all liability related to design; where the contractor does not rely in good faith on the designer's plans and specifications, the contractor is responsible for the increased costs arising from design defects. See Alpert, supra. Consequently, where a contractor encounters an "obvious omission, inconsistency, or discrepancy [in the design], he should take steps, by way of his own investigation, or by putting questions to the owner (or owner's representatives), to bridge gaps in the documents." Richardson Elec. Co., supra at 52. Compare John F. Miller Co. v. George Fichera Constr. Corp., 7 Mass. App. Ct. 494, 498 (1979) (if discrepancy is subtle, and if reasonable, conscientious contractor examining design "might miss a requirement which is out of sequence or ineptly expressed, the burden of the error falls on the issuer of the specifications").[6]

---

[6] Because the issue is not raised, we do not address the distinction between "performance" specifications and "design" specifications. See J. Lewin & C.E. Schaub, Jr., Construction Law § 7:4, at 467 (2014-2015) (design specifications "describe

Until today, we have not considered whether the owner's implied warranty of the designer's plans and specifications applies in public construction management at risk projects. See generally Bruner & O'Connor, Jr., supra at § 6:67, at 617 ("Because construction management is a newer approach and has not been the subject of as many court decisions, there is less certainty as to interpretation of the contract documents, and less uniformity as to the extent and allocation of responsibilities, and it is more difficult to predict liabilities"). When we adopted the implied warranty as part of our common law, public agencies were generally limited to using the design-bid-build method, see Lewin & Schaub, Jr., supra at § 17:41, at 1225; OIG Report, supra at 1, where the owner "is in control of the design development process" and the contractor "has no ability or opportunity to contemporaneously, meaningfully, or otherwise influence the process of design development and is required to construct in strict conformance with the furnished project design." Peterson, One Small Step in

_____

the materials to be used in the work and the manner in which the contractor's work is to be constructed in detail" while performance specifications "focus on the result to be achieved" and give contractor discretion as to how to complete final product). We assume for the purposes of reviewing the allowance of the motion to dismiss that the designs at issue in this case contain design specifications. See id. at 468 (contractor "cannot rely on an implied warranty to shield itself from liability arising out of defective performance specifications").

Mindset, One Giant Leap for the Construction Law Industry:  How the Judicial Stage Is Set for IPD and the Only Thing Missing Is Willing Participants, 39 N. Ky. L. Rev. 557, 561-562 (2012), quoting Hatem, Design Responsibility in Integrated Project Delivery:  Looking Back and Moving Forward 14 (Jan. 2008) (unpublished manuscript).

The relationship between the owner and the CMAR is different from the traditional relationship between the owner and the general contractor in a design-bid-build project.  The act defines "construction management at risk" as

> "a construction method wherein a construction management at risk firm provides a range of preconstruction services and construction management services which may include cost estimation and consultation regarding the design of the building project, the preparation and coordination of bid packages, scheduling, cost control, and value engineering, acting as the general contractor during the construction, detailing the trade contractor scope of work, holding the trade contracts and other subcontracts, prequalifying and evaluating trade contractors and subcontractors, and providing management and construction services, all at a [GMP], which shall represent the maximum amount to be paid by the public agency for the building project, including the cost of the work, the general conditions and the fee payable to the construction management at risk firm" (emphasis added).

G. L. c. 149A, § 2.  Unlike design-bid-build projects where the designer designs and the contractor builds, the CMAR may provide consultation regarding the design of the project and therefore may influence the project's final plans and specifications.  See OIG Report, supra at 9 ("final design may reflect or incorporate

substantial input from the [CMAR]").  Additionally, the CMAR agrees to a GMP and has the opportunity when negotiating the contract to consider the risk of incurring additional costs. See id. at 32 (construction management at risk contracts contain "CM Contingency," which is monetary amount intended to cover risk of "project costs that are not associated with scope changes or latent conditions encountered during the construction phase").  See also Bruner & O'Connor, Jr., supra at § 9:84, at 678 ("If . . . it can be clearly established that the contractor did or should have accounted for possible errors in the plans and specifications when pricing the work, then it appears inappropriate to hold the owner to this implied warranty standard").

As significant as these differences in relationship are, we are not persuaded that the relationships are so different that no implied warranty of the designer's plans and specifications should apply in construction management at risk contracts made pursuant to G. L. c. 149A and that the CMAR should bear all the additional costs caused by design defects.  See OIG Report, supra at 12-13, 58 ("Owner-generated design changes and incomplete or flawed plans and specifications may . . . warrant change orders that increase the contract price" and "owner is also responsible for the cost of change orders, which increase the original GMP").  See also Hackenbrach, An Overview of Major

Project Delivery Methods and Their Design Risk Allocation, in Shared Design § 3.01[C], at 3-11 (2011) (CMAR generally bears risk that actual costs to complete project may exceed price it has agreed upon with owner, "unless it can show that the costs increased due to owner-directed changes, the owner's actions or omissions, or other circumstances which the contract treats as within the owner's responsibility"). The CMAR may consult regarding the design of the project, but the owner, through the designer, ultimately controls the design and is the final arbiter of it; unless the contract states otherwise, the owner is generally under no obligation to accept the CMAR's suggestions regarding the plans and specifications. The implied warranty derives in part from the basic principle that "responsibility for a defect rests on the party to the construction contract who essentially controls and represents that it possesses skill in that phase of the overall construction process that substantially caused the defect." Sweet & Schneier, supra at § 16.02A. Although the CMAR may be more likely to bear some responsibility for a design defect than a general contractor in a design-bid-build project, we adhere to this basic principle by applying the implied warranty to public construction management at risk contracts, where the owner maintains control of the design by contracting a separate designer and may be able to transfer liability to the designer

responsible for the defect.  See Hackenbrach, supra at 3-12 ("In a 'textbook' [construction management at risk contract], the [CMAR] does not bear the risk of design deficiencies, as the owner retains a separate design professional and the [owner's implied warranty] applies . . .").

Nor are we persuaded that the Legislature, when it enabled the construction management at risk method in public building projects by enacting G. L. c. 149A, intended to abolish the owner's implied warranty and to require the CMAR to bear the entirety of the risk arising from design defects.  The statute states that the CMAR "may" provide "consultation" regarding the design but is not required to do so.  Ordinarily, to "consult" means to discuss, give advice, or confer.  See Milton v. Massachusetts Bay Transp. Auth., 356 Mass. 467, 474 n.8 (1969), quoting Webster's Third New International Dictionary 490 (1963) ("consult" defined as "to deliberate on," "discuss," "to ask advice of," "to take counsel," and "confer").  The possibility that the CMAR may consult regarding the building design does not suggest that the CMAR should be the guarantor against all design defects, even those that a reasonable CMAR would not have been able to detect.  Although the statute requires a GMP for the CMAR's services, the GMP may be established when only sixty per cent of the design documents have been developed.  The Legislature could not reasonably have intended that the CMAR, by

agreeing to a GMP, would bear all the risk arising from the design when the CMAR may not have seen as much as forty per cent of the design documents before agreeing upon a GMP. Even where a CMAR is given substantial consultative responsibilities regarding the design, the owner remains free to reject the CMAR's advice and suggestions. In addition, under G. L. c. 7C, § 51 (e), "[a] public agency shall not enter into a contract for design services unless the public agency or the designer . . . has obtained professional liability insurance covering negligent errors, omissions and acts of the designer," and the total amount of insurance "shall at a minimum equal the lesser of [$1 million] or [ten] per cent of the project's estimated cost of construction, or such larger amounts as the public agency may require." The statute does not permit a lesser amount of professional liability insurance in construction management at risk projects. Based on the language of G. L. cc. 149A and 7C, we understand that the legislative intent in providing the construction management at risk alternative was to permit the CMAR a greater consultative role regarding the project's design, not to eliminate the owner's responsibility for design defects.

Although the owner's implied warranty applies in a public construction management at risk contract, the differences between the responsibilities of a general contractor in a design-bid-build project and those of a CMAR affect the scope of

the implied warranty. The general contractor in a design-bid-build project may benefit from the implied warranty where it relied on the plans and specifications in good faith, but the CMAR may benefit from the implied warranty only where it has acted in good faith reliance on the design and acted reasonably in light of the CMAR's own design responsibilities. The CMAR's level of participation in the design phase of the project and the extent to which the contract delegates design responsibility to the CMAR may affect a fact finder's determination as to whether the CMAR's reliance was reasonable. The greater the CMAR's design responsibilities in the contract, the greater the CMAR's burden will be to show, when it seeks to establish the owner's liability under the implied warranty, that its reliance on the defective design was both reasonable and in good faith. See generally Sweet & Schneier, supra at § 14.04 ("all of the modern variations [on the design-bid-build method] have as a common denominator: a blurring of the lines of responsibility"). Therefore, the CMAR may recover damages caused by the breach of the implied warranty, but only if it satisfies its burden of proving that its reliance on the defective plans and specifications was reasonable and in good faith. The amount of recoverable damages may be limited to that which is caused by the CMAR's reasonable and good faith reliance

on design defects that constitute a breach of the implied warranty.

2. Express disclaimer of implied warranty. Having found that there is an implied warranty of the designer's plans and specifications in construction management at risk contracts made pursuant to G. L. c. 149A, we now consider whether the contract between DCAM and Gilbane expressly disclaims the owner's implied warranty. See Daniel O'Connell's Sons v. Commonwealth, 349 Mass. 642, 647-648 (1965) ("express disclaimer" of owner's responsibility for accuracy of geological data precluded liability based on contractor's reliance on such data); D. Federico Co. v. Commonwealth, 11 Mass. App. Ct. 248, 252 (1981) (implied warranty not recognized "where the contract terms specifically precluded warranty of, or reliance on" designer's quantity estimates). See also White v. Edsall Constr. Co., 296 F.3d 1081, 1085 (Fed. Cir. 2002) ("Only express and specific disclaimers suffice to overcome the implied warranty that accompanies design specifications"); Lewin & Schaub, Jr., supra at § 7:3, at 466 ("implied warranty [of design sufficiency] . . . may be mitigated by an express disclaimer of liability").

We find no express disclaimer of the implied warranty of the designer's plans and specifications in the contract between DCAM and Gilbane. We note that DCAM, on appeal, concedes that "the Superior Court's dismissal in this case does not negate

principle that the owner remains liable to the [CMAR] for design changes, errors and omissions which flow from the work of the designer" and that "[i]f Gilbane is found liable to Coghlin and the liability flows from design issues rather than other aspects of [Gilbane's] responsibilities, then there would have to be an allocation of that liability between Gilbane, [DCAM] and the [D]esigner." DCAM and Gilbane agree that the contract does not impose full responsibility for design defects on Gilbane, and the contract supports their interpretation.

As the judge recognized, the contract delegates extensive responsibilities to Gilbane to "carefully study" and "carefully compare" all design-related documents; "take field measurements and verify field conditions," compare them to the designs, and "report to the Designer any questions, errors, inconsistencies, or omissions." Gilbane must "review" the designs "on a continuous basis" with a group of architects or engineers in order to "discover inconsistencies, errors and omissions," and "review the design documents for clarity, consistency, constructability, maintainability/operability and coordination among the trades." Gilbane also must attend Project meetings with DCAM and the Designer and "consult with DCAM and the Designer concerning planning for construction of the Project."

Although Gilbane undertakes significant design-related obligations, there is no express abrogation of the implied

warranty.  See White, 296 F.3d at 1085, citing Spearin, 248 U.S. at 137 ("general disclaimers requiring the contractor to check plans and determine project requirements do not overcome the implied warranty, and thus do not shift the risk of design flaws to contractors who follow the specifications").  The contract instead states that the "recommendations and advice of [Gilbane] concerning design modifications and alternatives shall be subject to the review and approval of DCAM," and, the Designer "shall decide all questions which may arise as to the interpretation of the [designs] and as to the fulfillment of this Contract on the part of [Gilbane]."  Such provisions show that the Designer and DCAM maintain authority and control over the Project's design.  In comparison, when describing some of Gilbane's design-related responsibilities, the contract states:

> "[Gilbane] shall consult with DCAM and the Designer regarding the selection of materials, building systems and equipment, and shall recommend alternative solutions whenever design details affect construction feasibility, schedules, cost or quality (without, however, assuming the Designer's responsibility for design) and shall provide other value engineering services to DCAM" (emphasis added).

In stating that Gilbane shall recommend alternative design-related solutions, without assuming "the Designer's responsibility for design," the plain language of the contract supports, rather than disclaims, the implied warranty.[7]

_____

[7] The "No Personal Liability; Consequential Damages" provision of the "Miscellaneous Provisions" article, stating,

Thus, in the absence of an express disclaimer, the owner's implied warranty of the designer's plans and specifications applies.  Here, Gilbane has undertaken extensive design review and consultation obligations while the Designer remains responsible for producing the designs.  If Gilbane is found liable for additional costs to Coghlin, Gilbane may be able to recover, but only to the extent that the additional costs were caused by Gilbane's reasonable and good faith reliance on the defective plans and specifications that resulted in a breach of the owner's implied warranty, despite Gilbane's own contractual design responsibilities.

3.  Indemnification provision.  Section one of the indemnification provision of the contract provides in pertinent part:

"To the fullest extent permitted by law, [Gilbane] shall indemnify, defend . . . and hold harmless DCAM and their officers, agents, . . . employees, [and] representatives . . . from and against all claims, damages, losses and expenses, including but not limited to court costs and attorneys' fees, arising out of or resulting from the performance of the Work, including but not limited to those arising or resulting from:  labor performed or furnished and/or materials used or employed in the performance of the Work; violations by [Gilbane] . . . of any Laws; violations of any provision of this Contract by [Gilbane] . . . ; injuries to any persons or damage to any property in

---

"In no event shall DCAM or [Ellenzweig Associates (Designer)] be liable to the [CMAR] except for obligations expressly assumed by DCAM or the Designer under the Contract Documents," does not constitute a specific or express disclaimer of the implied warranty of the designer's plans and specifications.

connection with the Work; or any act, omission, or neglect of [Gilbane's] Personnel.[8]

"[Gilbane] shall be obligated as provided above, regardless of whether or not such claims, damages, losses and/or expenses, are caused in whole or in part by the actions or inactions of a party indemnified hereunder. . . ."

Section two of the provision, titled "Designer's Actions,"

states:

"The obligations of [Gilbane] under Section [one] above shall not extend to the liability of the Designer, its agents or employees, arising out of (i) the preparation or approval of maps, Drawings, opinions, reports, surveys[,] Change Orders, designs or Specifications, or (ii) the giving of or the failure to give directions or instructions by the Designer, its agents or employees provided such giving or failure to give is the primary cause of the injury or damage."

The judge concluded that the indemnification provision required Gilbane to indemnify DCAM for "any liability" that might be imposed upon DCAM as a result of Gilbane's own third-

---

[8] "Work" is a defined term in the contract:

"The Work consists of all the work identified in the Contract Documents.  The Work comprises the completed construction required by the Contract Documents and includes all labor, tools, materials, supplies, equipment, permits, approvals, paperwork, calculations, submittals, and certificates necessary to develop, construct and complete the Work in accordance with all Laws, and all construction and other services required to be supervised, overseen, performed or furnished by [Gilbane] or that the Contract Documents require [Gilbane] to cause to be supervised, overseen, performed or furnished. [Gilbane] shall provide and perform for the Contract Price all of the duties and obligations set forth in the Contract Documents."

party claims. Thus, according to the judge, Gilbane's third-party complaint created an impermissible "circuity of obligation," because Gilbane may not seek damages from DCAM when DCAM would have a right to be indemnified by Gilbane for those same damages. Furthermore, the judge rejected Gilbane's contention that section two excluded any obligation to indemnify, defend, and hold harmless DCAM for design defects, and found that section two only excused Gilbane from the obligation to indemnify, defend, and hold harmless the Designer, as one of DCAM's "agents [or] representatives."

The judge's reasoning was premised on his conclusion that Gilbane did not have the benefit of the implied warranty of the designer's plans and specifications. We instead interpret the indemnification provision in light of the implied warranty and conclude that, although broad in scope, the indemnification provision does not cover claims, damages, losses, and expenses arising out of the Designer's work, as opposed to Gilbane's design-related duties. Here, the contract states that the indemnification provision is triggered by claims, damages, losses, and expenses "arising out of or resulting from the performance of the Work," which we interpret to mean Gilbane's performance. See Bruner & O'Connor, Jr., supra at § 10:58 ("Nearly every indemnity provision contains language limiting the indemnitor's obligation to loss occasioned in some way or

another to the activities or work of the indemnitor").[9]  As part of its "Work" under the contract, Gilbane is responsible for "construction and other services required to be supervised [and] overseen," but Gilbane does not "supervise" or "oversee" the Designer's work.  See Department of Community Affairs v. Massachusetts State College Bldg. Auth., 378 Mass. 418, 430 (1979), quoting Fluet v. McCabe, 299 Mass. 173, 179 (1938) ("to supervise" means "to oversee, to have oversight of, to superintend the execution of or performance of [a thing], or the movements or work of [a person]; to inspect with authority; to inspect and direct the work of others").  Rather, the contract provides that Gilbane's recommendations are subject to the review and approval of DCAM and that the Designer has authority over the interpretation of the designs.  Gilbane reviews and consults regarding the designs, but the contract expressly declares that Gilbane does not assume the "Designer's responsibility for design."  In light of the implied warranty of the designer's plans and specifications, and the contractual definition of "Work," we conclude that claims, damages, losses, and expenses that arise out of the Designer's performance, as

---

[9] In its brief, DCAM states that the contract "requires Gilbane to defend DCAM from all claims "arising out of the performance of Gilbane's work."  Moreover, DCAM describes the contractual definition of "Work" as defining "'Work' for which Gilbane is responsible."

opposed to Gilbane's design consultation and review performance, do not trigger the indemnification provision.[10]

Furthermore, we conclude that section two of the indemnification provision exempts Gilbane of its obligations to defend, indemnify, or hold harmless both the Designer and DCAM for additional costs caused by design defects.  The judge interpreted this section as exempting only the Designer from Gilbane's duties under section one of the indemnification provision.  But where the owner, through the implied warranty, is legally responsible for the designer's plans and specifications, and where the CMAR has a contractual relationship with the owner but not the designer, the apparent purpose of this provision can be wholly accomplished only by interpreting it to include both the designer and the owner who impliedly warrants the designer's plans and specifications.  See Key Constr., Inc. v. State Auto Prop. & Cas. Ins. Co., 551 F. Supp. 2d 1266, 1268, 1270-1271 & n.2 (D. Kan. 2008) (applying Oklahoma law, subcontractor not required to indemnify contractor for losses or injuries caused by architect's plans and specifications, where indemnification provision stated that

---

[10] Because Gilbane has plausibly alleged that the claims of Coghlin, for which it seeks recovery from DCAM, arise out of design defects attributable to the Designer, and are therefore outside of the triggering language of the indemnification provision, we do not address DCAM's circuity of obligation argument.

subcontractor's obligations "shall not extend to the liability of the Architect"). If we were to interpret section two as the judge did, the Designer effectively would be indemnified by Gilbane for increased labor and material costs arising from defects in its design, even though the contract expressly declares that Gilbane has no duty to indemnify the Designer. The reason is that Gilbane can only sue DCAM, not the Designer, to recover these additional costs under its contract, and would be barred from doing so under the judge's interpretation, thus negating any possibility that the Designer would need to defend a third-party claim brought by DCAM to recover these damages. Therefore, we conclude that Gilbane is exempt from its obligations to indemnify, defend, and hold harmless DCAM for damages caused by defects in the Designer's plans and specifications that constitute a breach of the implied warranty, and that the indemnification provision does not bar Gilbane's third-party complaint.

4. _Third-party complaint_. DCAM contends that, even if it may be found liable to Gilbane for defects in the Designer's work, the third-party complaint was properly dismissed, because Gilbane may only bring a claim against DCAM after Coghlin wins a judgment against Gilbane based at least in part on a finding of "liability" attributable to the Designer's work. According to DCAM, Gilbane's filing of a third-party complaint against DCAM

is inconsistent with its duty to defend DCAM under the indemnification provision. It contends that compliance with that provision requires Gilbane first to defend against Coghlin's claims to final resolution. Pursuant to this argument, only if Gilbane is found liable to Coghlin, and that liability is attributable to the Designer's work, may Gilbane pursue a claim against DCAM.

Rule 14 of the Massachusetts Rules of Civil Procedure, as amended, 385 Mass. 1216 (1982), seeks to avoid the duplicative efforts that DCAM's interpretation would dictate, by allowing a defendant to file a third-party complaint against a party "who is or may be liable" to the defendant "for all or part of the plaintiff's claim against him." "Because Rule 14 expressly allows what is in effect anticipatory litigation, a third-party defendant may not and should not object on the grounds that the defendant's liability has not yet been established." Reporters' Notes to Rule 14, Mass. Ann. Laws Court Rules, Rules of Civil Procedure, at 335 (LexisNexis 2014-2015). Where the claims alleged do not trigger the indemnification provision, and a two-step procedure would run counter to the purposes of rule 14 and common practice in construction law, we shall not interpret the duty to defend or any other obligation in the indemnification provision to require Gilbane to forebear from filing suit against DCAM until a judgment has been obtained in the Coghlin

suit, unless there is express language in the contract requiring these two steps. See Sweet & Schneier, supra at § 2.06 ("In construction disputes, it is common for the defendant to assert a counterclaim against the plaintiff or to make claims against third parties arising from the same transaction"). See, e.g., Campbell Hardware, Inc. v. R.W. Granger & Sons, 401 Mass. 278, 279 (1987) (public construction dispute in which subcontractor sued general contractor for additional work performed and general contractor brought third-party action against public owner). There is no such express language in the contract between DCAM and Gilbane. Therefore, we decline to prevent Gilbane from bringing its third-party complaint.

Conclusion. Because Gilbane's third-party complaint against DCAM plausibly states a claim for relief, we vacate the allowance of the motion to dismiss and the entry of judgment, and we remand the case to the Superior Court for further proceedings consistent with this opinion.[11]

So ordered.

---

[11] We acknowledge that Gilbane has requested that we take judicial notice of the contract between DCAM and the Designer as a public record, even though it was neither referenced in nor appended to the pleadings. In light of our reversal of the dismissal in this case, we need not decide the issue.