SUPERIOR COURT 
 
 CITY OF BOSTON v. QUINCY CONSERVATION COMMISSION & others[1]

 
 Docket:
 SUCV2018 03440
 
 
 Dates:
 December, 2020
 
 
 Present:
 /s/Gregg J. Pasquale, Justice of the Superior Court
 
 
 County:
 SUFFOLK, ss.
 

 
 Keywords:
 MEMORANDUM OF DECISION AND ORDER ON CITY OF BOSTON'S PARTIAL MOTION FOR JUDGMENT ON THE PLEADINGS AND DEFENDANTS' CROSS MOTION FOR JUDGMENT ON THE PLEADINGS
 
 

 
     The City of Boston ("Boston") filed this action seeking judicial review of the September 25, 2018 decision of the Quincy Conservation Commission denying Boston's application for an order of conditions to rebuild the Long Island Bridge. For the reasons discussed below, the City of Boston's Partial Motion for Judgment on the Pleadings is ALLOWED and the Defendants' Cross‑Motion for Judgment on the Pleadings is DENIED.
BACKGROUND 
     The following facts are taken from the administrative record. On May 17, 2018, TRC Environmental, on behalf of the City of Boston Public Works Department, filed a Notice of Intent ("NOI@) with the Quincy Conservation Commission ("the Commission") under both the Wetlands Protection Act, G.L.c. 131, ' 40 ("WPA"), and the Quincy Wetlands Protection Ordinance ("the Ordinance") to replace the superstructure of the Long Island Bridge between Moon Island and Long Island, over Boston Harbor and Quincy Bay ("the Bridge"), in order to restore access to the existing Boston Public Health opioid addiction treatment and homeless
--------------------
     [1]John T. Brennion, E. James Iorio, William Keener, Victoria Lebate, Maureen C. Glynn, Jeffrey Graeber, and Tom Carroll, in their official capacity as members of the Quincy Conservation Commission, and Jay Duca, in his capacity as agent for the Quincy Conservation Commission
-1-
facilities on Long Island ("the Project"). The original bridge was constructed in 1950, deemed structurally unsound in 2014, and demolished in 2015 for public safety reasons. The portion of the Project in Quincy involves placing new bridge spans over the existing piers and improving the stormwater system. The proposed Quincy work would occur in coastal wetland resource areas with a temporary impact but no anticipated permanent impact. The Project is subject to the Department of Environmental Protection ("DEP") Stormwater Management Standards set forth at 310 Code Mass. Regs. ' 10.05(6)(k)‑(q),
     The Project involves no temporary or permanent impact to land under ocean because the original bridge piers were left in place in Boston Harbor/Quincy Bay and the Project will utilize those existing piers. The Project will involve a temporary impact to 80 square feet of coastal beach at Moon Island and 512 square feet of coastal bank where the Bridge will meet land on Moon Island. This temporary impact consists of noise, turbidity, and impact to fish and shellfish and fisheries habitat on the ocean bottom and intertidal areas. There will be 592 square feet of temporary alteration of land subject to coastal storm flowage to install four temporary pipe piles during the installation of the Bridge.

     The NOI included a May 2018 Stormwater Management Report prepared for Boston by STV, Inc. The proposed surface area of the Bridge is 2.6 acres. The original bridge had scuppers that drained runoff directly into the harbor below. The Project involves collecting runoff in scuppers but routing it through a closed drainage system back to each island to be treated and then released into Boston Harbor/Quincy Bay. The Report states that DEP Stormwater Management Standards are applicable to the Project only to the maximum extent practicable because the Project is a redevelopment project. With respect to Standard 3 for Stormwater Recharge, because of the steep slope of Moon Island, there cannot be stormwater
-2-
recharge in the vicinity of the Project. Standards 1 (no new untreated discharge), 2 (peak rate attenuation), 9 (operation and maintenance plan) and 10 (prohibition of illicit discharges) are fully met. With respect to Standard 4, Water Quality, the Report attached a long‑term pollution prevention plan, and calculations‑showing that the system meets the 80% TSS removal requirement. With respect to Standard 8, the Report states that a Pollution Prevention and Erosion and Sedimentation Control Plan is not included but will be submitted before land disturbance begins. The Report included an April 30, 2018 Custom Soil Resource Report for Norfolk and Suffolk Counties.
     Included in the record are the meeting minutes from the May 16, 2018 public hearing on the Project conducted by the Boston Conservation Commission, which ultimately issued an Order of Conditions for the Project. At this hearing, Special Environmental Counsel for the City of Quincy, John Shea, raised concerns about the Project, including the structural integrity of the piers, and the lack of presentation and evaluation of alternatives to the Project. A representative of Tighe & Bond, the engineering consultant hired by the City of Quincy, recommended that an alternatives analysis be included addressing ferry service, questioned the structural integrity of the piers, and characterized as inadequate the information provided about stormwater management compliance.
     By letter dated June 1, 2018, the Division of Fisheries and Wildlife notified Boston that it had determined that the Project will not adversely affect the resource area habitat of state‑protected rare wildlife species and will not result in a prohibited "take" under the Massachusetts Endangered Species Act.
     The Commission held a public hearing on Boston's NOI on June 6, 2018. STV's design lead for the Project, Mark Ennis, and Sam Moffett from TRC Engineering gave a presentation on
-3-
the Project, explaining that the pier structures will be reinforced after which the bridge spans will be floated into place by barge with zero wetlands impact on land under the ocean. Reinforcement of the pier involves removing the granite cap pieces, drilling posts down through the concrete, and then pouring a concrete cap. Moffett explained that Boston would use the existing foundation of Pier 1 to stage equipment and construct a temporary trestle structure, which requires dragging four steel pipe piles, impacting 80 square feet in the buffer zone of the coastal beach area and 512 square feet of costal bank.

     Special Environmental Counsel for Quincy, John Shea, stated that this was a big project for Quincy and "the Mayor and neighbors are opposed to the access through Quincy for the drug treatment program." Shea stated that water access is a more cost effective alternative with fewer environmental impacts. He noted that Mayor Menino had studied and endorsed water access to Long Island, but Mayor Walsh "apparently, has a different agenda." Shea then stated that he was not asking the Commission to make a political decision about access but rather, to demand sufficient information to evaluate the Project under the WPA and Ordinance. Shea noted that although alternatives analysis and hazardous materials fall under the Massachusetts Environmental Protection Act ("MEPA"), that is not a permitting scheme that can impose substantive requirements on projects.
     Tracy Adamski, a wetlands specialist with Tighe & Bond, expressed concern that the NOI did not adequately identify the potential impact of the Project. He noted that the NOI only discusses above‑water repairs to the piers but the Commission should consider the impacts if underwater repairs need to be made due to structural deterioration. He specifically raised the possibility of alkali‑silica reaction reactivity ("ASR") of the concrete. The use of cofferdams to repair or replace the piers would impact an additional 900 square feet of land under water for
-4-
     each of the six piers in Quincy, for a total of 5,400 square feet of impact unaccounted for in the NOI. Adamski also expressed concern about improvements that might need to be made to Moon Island Road, which provides access to the Bridge.
     City of Quincy engineer Paul Costello reviewed the NOI and concurred with Tighe & Bond that there was an issue with the structural integrity of the piers and the estimated impact on wetlands resources. He noted that there was lead on the ocean floor from the piers and there were voids that needed repair, necessitating the use of cofferdams and an additional 5,000 square foot impact. David Murphy, an engineer from Tighe & Bond, stated that their dive team inspected the underwater piers and found significant deterioration of the concrete, settlement of the granite blocks, and pointing of the granite blocks, as well as lead around the piers, correction of which would have associated environmental impacts.
     A Ward Councilor from Moon Island opposed the Project and stated that water access was less expensive and would have less impact on the environment. A State Representative spoke and strongly opposed the Project. Several members of the community spoke and complained that the community was not being consulted in connection with the Project.
     Ennis then stated that STV has extensive experience in evaluating the structural integrity of bridges and the reuse of piles or piers, and has completed numerous bridge projects throughout the state. STV reconstructed the Longfellow Bridge and Boston University Bridge re‑using the original timber piles without the use of cofferdams. He stated that STV will remove all lead when it re‑grouts the masonry joints of the piers and could clean up the lead lying on the seabed from the demolition. Sammy Nabulsi of the City of Boston Law Department noted that MEPA compliance is mandatory and that numerous other agencies, including the Coast Guard and the Mass. Division of Fisheries, will evaluate the Project. He noted that the WPA does not
-5-

require an alternatives analysis for projects other than those affecting riverfronts. At the recommendation of Quincy Conservation Agent Jay Duca, the Commission requested more information from Boston and continued the public hearing until August 1, 2018.
     In a letter dated June 6, 2018, the Commission requested additional information from Boston that it deemed essential to its review of the NOI. The information related to structural concerns about the condition of the existing piers, permit requirements, transportation concerns and wetlands impacts, resource area impact calculations and performance standards, hazardous materials, and stormwater management.
     Boston responded to the Commission by letter dated July 13, 2018, noting that structural concerns with the piers are not within the Commission's jurisdiction because the repair work relating to the piers will not occur within any area protected by the WPA or Ordinance. However, Boston gave the Commission a courtesy copy of its Preliminary Structures Report. With respect to pier repair debris, Boston noted that an Order of Conditions from the Boston Conservation Commission prevents the Project from releasing debris into the water or wetlands. Boston stated that the Commission's concerns with high speed ferry collision and testing of the seawall concrete were not within the Commission's jurisdiction because they do not involve wetlands in Quincy. With respect to concerns about Moon Island Road, Boston noted that it did not propose any work to the road.
     With respect to the Commission's request for an evaluation of transportation by ferry service, Boston stated that neither the WPA nor the Ordinance require consideration of project alternatives. In addition, whether the Project meets multi‑modal transportation needs is not within the Commission's jurisdiction. In response to the Commission's request that it address the seabed impact from barge spudding, Boston noted that the use of spuds does not "alter"
-6-
wetlands under the WPA and that the Commission allowed spudding in connection with the demolition of the original bridge and the utility replacement project. In response to the Commission's concern about impacts from the movement of sediment associated with Pier 1, Boston stated that there would be no modification of the existing Pier 1 foundation, which will be used for temporary construction staging with minimal activity within the coastal bank.
     With respect to compliance with stormwater performance standards, Boston stated that the work on the Pier 1 coastal bank is minimal and would not cause erosion or destabilization, and standards 7 and 8 do not apply because there is no coastal engineering structure involved. Boston noted that the Boston Conservation Commission Order of Conditions provides protection against seafloor impacts. Boston stated that its Stormwater Pollution Prevention Plan would not be finalized until a contractor is selected, consistent with standard practice. Boston submitted a copy of the Order of Conditions of the Boston Conservation Commission.
     On July 31, 2018, Boston filed a Notice of Project Change with the Secretary of the Executive Office of Energy and Environmental Affairs under the Massachusetts Environmental Protection Act, requesting a determination that no further MEPA review was required. This Notice of Project Change addressed the alternative of ferry access to Long Island but concluded that it would not meet the needs of the public health facilities on the island, would have significant environmental impacts, and would have high installation, operation, and maintenance costs.

     The August 1, 2018 public hearing on Boston's NO1 was continued for lack of a quorum. By letter dated August 21, 2018, Tighe & Bond stated that the structural integrity of the existing piers and Project is within the Commission's jurisdiction because the piers are man‑made structures in land under water, and proposed repairs could potentially result in impacts to
-7-
pollution, shellfish, fisheries, and wildlife habitat. Tighe & Bond recommended that the Commission seek further information from Boston about structural integrity, wind on live load calculations, sea level rise in the deck design, barge spud impact, the use of vehicles with tires to place the temporary structure, methods for minimizing sediment mobilization, and evaluating water quality impact. Tighe & Bond also recommended that the Commission require Boston to provide a draft Stormwater Pollution Prevention Plan.
     Boston responded by letter dated August 28, 2018 stating that the Commission had sufficient information to issue an Order of Conditions, did not have the expansive jurisdiction claimed by Tighe & Bond, and was prematurely requiring advanced design and construction phase means and methods information that will be guided by other permitting agencies on the Project.
     Tighe & Bond engineer David Gress evaluated reports about the condition of the existing concrete piers and made recommendations. He concluded that the cost‑effective engineering life of the concrete has expired and it is unrealistic to think it can support a new bridge for another 75 years given its deteriorated condition. He recommended further concrete testing.
     The Commission held a further public hearing on Boston's NOI on September 5, 2018. Moffett stated that TRC had designed the Bridge to minimize environmental impact for safe use for 75 years, with higher elevations to account for a potential sea level rise. He explained that the MEPA Notice of Project Change included repairs to the piers that did not include cofferdams, would be done at low tide with respect to areas below the waterline, would not alter the harbor floor, and would include best management practices to avoid debris released into the harbor. The contractor performing these repairs would have a contract provision preventing it from bottoming out its barges.
-8-
     Quincy's Special Environmental Counsel, John Shea, stated that the Commission was entitled to determine what mitigation was necessary to protect wetlands from the greater repair or replacement of the piers. He also stated that the Commission should not defer the appropriate best management practices to Boston's contractor. He recommended that the Commission demand further information under the Ordinance and demand final plans before approving the Project. Duncan Mellor, a coastal engineer with Tighe & Bond, stated that Gress reviewed the structural documents relating to the piers and determined that the piers show ASR, causing cracking of the concrete which is expected to accelerate over time. Gress concluded that further testing of the piers is needed to determine their structural integrity. Sammy Nabulsi of the City of Boston Law Department stated that the Commission could impose a condition in the order of conditions that before work begins, Boston must provide the Commission with all final plans and designs and if there is a change in impact, Boston will have to respond.

     After the Commissioners cited to Gress's report, William Goulet stated that Boston had tested the piers in accordance with AASHTO standards and concluded that the ASR was minor and not structural degradation. He disputed that more testing was required, although he clarified that Boston did not test the underwater areas of the piers but tested the splash zone, where deterioration is most likely to occur from wetting and then drying. He noted that it appeared that Gress did not consider the proposed repairs to the piers. The Commission asked Boston for a formal response to Gress's report, expressing concern that the Bridge might deteriorate sooner than 75 years, causing additional impacts to resource areas. Boston objected to any further continuance of the hearing on the NU The Commission then voted unanimously to deny an order of conditions for the Project.
-9-
     In a decision dated September 25, 2018, the Commission found that under the WPA, the Project involves the following interests: land containing shellfish, fisheries, prevention of pollution, and protection of wildlife habitat. In addition, the Project impacts no land under the ocean but 80 square feet of coastal beaches and 512 square feet of coastal banks. The Commission denied an order of conditions for the Project, finding that the proposed work cannot be conditioned to meet wetlands performance standards. The Commission also found that the information submitted by Boston was insufficient to describe the effect of the work on the interests protected by the WPA. The Commission concluded that the proposed work cannot be conditioned to meet the standards of the Ordinance because there was "insufficient information to determine the impact to the resource area based upon expert reports and testimony from Quincy's Engineering Team."
     Specifically, the Commission found that Boston did not fully quantify adverse impacts to land under the ocean and wetlands, and did not propose sufficient mitigation to meet performance standards that will result from the repair and replacement of some or all of the concrete piers. The Commission concluded that Boston did not adequately refute Tighe & Bond's calculation of adverse impacts from the use of cofferdams. In addition, the Commission credited Tighe & Bond's and Gress's conclusion that the concrete piers need extensive repairs and replacement and the use of cofferdams. Therefore, Boston did not adequately assess and propose mitigation for impacts to fisheries, land containing shellfish, wildlife habitat, and prevention of pollution. The Commission found that Boston did not provide sufficient information on the condition of the piers and necessary repair and replacements, the impact from the use of cofferdams, and potential mitigation, and without this information, the Project cannot be conditioned to meet the applicable performance standards. The Commission noted that
-10-
     Boston rejected the opportunity to continue the public hearing to conduct concrete testing and present its own report. The Commission further found that Boston failed to provide performance requirements or potential best management practices for review, and failed to provide a draft stormwater pollution protection plan. Finally, the Commission stated that it was unable to determine whether the ferry alternative would minimize wetlands impacts compared to the piers requiring repair or replacement.

     Boston filed this action on November 2, 2018. Counts I and II of the complaint seek certiorari review under G.L.c. 249, ' 4, alleging that the denial of an order of conditions was arbitrary and capricious. Count III seeks certiorari review under G.L.c. 249, ' 4, alleging that the denial of an order of conditions was unsupported by substantial evidence. Counts IV and V seek a declaratory judgment under G.L.c. 231A that the Commission's decision is unconstitutional.
     Boston appealed the denial of the Project under the WPA to the Department of Environmental Protection ("DEP"), seeking a superseding order of conditions. In addition, the City of Quincy had appealed the Order of Conditions issued by the Boston Conservation Commission. DEP consolidated these two appeals. DEP requested additional information from Boston including details about the proposed stormwater management design and plans. On June 6, 2019, DEP issued a Superseding Order of Conditions in both appeals, finding that the Project meets the performance standards of the WPA for the affected wetlands resources in Quincy and Boston, and minimizes impacts to coastal wetlands. DEP further found that the Project will provide stormwater treatment to the maximum extent practicable, as required for a Redevelopment project. DEP' s SOC contains thirty‑one special conditions for the Project. Boston did not move to re‑open the administrative record in this case to include the SOC.
-11-
     On June 6, 2019, this Court (Wilkins, J.) ordered the Commission to consider certain supplemental materials that it appeared Boston had submitted to Quincy's consultants but not to the Commission directly. Boston submitted these materials at a July 10, 2019 meeting of the Commission. The materials included a May 2018 Boston/Quincy Long Island Bridge Over Boston Harbor Bridge Type Selection Report, a May 14, 2018 Geotechnical Report, a May 15, 2015 post‑demolition Long Island Bay Bridge Inspection Report, and a March 5, 2018 Department of Transportation Structures Inspection Field Report. In addition, a May 2018 Preliminary Structures Report went into great detail about the testing performed on the piers. This report concluded, based on extensive testing, that the ASR on the piers was minimal and did not compromise the structural integrity of the piers, and that repointing of the piers would prevent deterioration from the freeze/thaw cycle.
The Commission also received a September 2002 Long Island Limited Public Access Plan Final Report prepared for Boston and an April 2001 Long Island Water Transportation Investigations Findings Report prepared for Boston, both of which discuss water access to Long Island. The Commission continued the matter until August in order to hold a public hearing.
     On August 21, 2019, the Commission held a Special Public Hearing limited in scope to consideration under the Ordinance of only the new materials presented to the Commission. Counsel for the City of Quincy clarified that the supplemental materials previously had been provided to and considered by both Tighe & Bond and Gress when they made their recommendations to the Commission. Attorney Nabulsi noted that the May 2018 Boston/Quincy Long Island Bridge Over Boston Harbor Bridge Type Selection Report chose a girder structure bridge with a high deck structure, rather than a truss structure (the original bridge structure), to address concerns about sea level rise. He emphasized that the May 2018
-12-

     Preliminary Structures Report details the inspections and testing of the piers and proposes modifications and repairs necessary to enable the Bridge to last 75 years. At the end of the hearing, the Commission voted unanimously to affirm its prior decision.
     On September 4, 2019, the Commission issued its Amended and Supplemental Decision under the Quincy Wetlands Protection Ordinance affirming its prior denial of an order of conditions for the Project. The Commission concluded that Boston had not met its burden of production and proof to show that the Project would not have an adverse effect on wetlands values under the Ordinance. The Commission found that Boston did not fully quantify adverse impacts to land under ocean and wetlands or propose sufficient mitigation to meet performance standards with respect to the repair and replacement of the concrete piers. The Commission relied on Tighe & Bond's evidence that some or all of the piers need extensive repairs or replacement due to ASR, freeze‑thaw, and chloride deterioration and degradation, and its calculation that the use of cofferdams to do this, as a best engineering practice, would have an adverse impact in excess of 5,400 square feet on fisheries, land containing shellfish, wildlife habitat, and prevention of pollution.
     The Commission further found that Boston did not provide sufficient information on the wetlands impact from the needed repairs to Moon Island Road, the access to the Bridge, and also failed to provide information about a bedrock fault along the Bridge footprint and how it will meet seismic engineering requirements. The Commission found that Boston did not design the deck height of the Bridge to comply with Boston's Climate Change Consensus Project to ensure protection from predicted sea level rise within land subject to coastal storm flowage.
     In addition, the Commission found that Boston failed to provide specific mitigation measures to protect land under the ocean and land containing shellfish and meet the performance
-13-
standards under the Ordinance. Instead, Boston stated that the means and methods would be determined by the selected contractor and best management practices would be included in the contract documents. Boston did not provide a draft stormwater pollution protection plan as requested by the Commission. Finally, the Commission concluded that the alternatives analysis on the use of ferry service and docks was conclusory and lacked adequate supporting data. For all these reasons, the Commission denied an order of conditions for the Project under the Ordinance.
DISCUSSION
I.          CERTIORARI REVIEW
     Counts I and II of Boston's complaint seek certiorari review under G.L.c. 249, ' 4, alleging that the denial of an order of conditions was arbitrary and capricious. Count III seeks certiorari review under G.L.c. 249, ' 4, alleging that the denial of an order of conditions was unsupported by substantial evidence.
Pre‑emption by Superseding Order of Conditions
     Boston contends that the Ordinance is no more protective than the WPA and therefore, the Commission's denial of an order of conditions is superseded by the SOC allowing the Project to proceed. The WPA establishes Statewide minimum wetlands protection standards, but permits local communities to impose more stringent requirements. Oyster Creek Preservation,  Inc. v. Conservation Comm'n of Harwich, 449 Mass. 859, 866 (2007). Where a conservation commission's decision is based on the WPA or a local bylaw that applies the same standards as the WPA, DEP has the final word, and its decision preempts the local commission's decision. Healer v. Department of Envt'l Prot., 73 Mass. App. Ct. 714, 719 (2009). In such a case, a claim

-14-
for judicial review of the commission's decision is mooted by DEP's superseding order, which must be challenged under Chapter 30A. DeGrace v. Conservation Comm'n of Harwich, 31 Mass. App. Ct. 132, 136 (1991). See also Williams Bros., Inc. of Marshfield v. Conservation Comm'n of Carver, 2012 WL 2135507 at *2 (Mass. App. Ct. Rule 1:28) (where there is controlling DEP superseding order, court should not annul local commission's decision but should dismiss the complaint for certiorari review). However, where the conservation commission's decision rests on the provisions of a local bylaw that are more protective than the WPA, a superseding order of conditions issued by DEP cannot preempt the commission's bylaw‑based determination. Oyster Creek Preservation, Inc. v. Conservation Comm'n of Harwich, 449 Mass. at 865; FIC Homes of Blackstone. Inc. v. Conservation Comm'n of Blackstone, 41 Mass. App. Ct. 681, 686 (1996), rev. den., 424 Mass. 1104 (1997).
Motion to Strike 
     As a preliminary matter, the Commission requests that the court strike the SOC from the record and not consider it because Boston failed to comply with the procedure for expanding the administrative record under Standing Order 1‑96 and G.L.c. 30A, ' 14(6). Cf. Delapa v. Conservation Comm'n of Falmouth, 93 Mass. App. Ct. 729, 733 n.9 (2018) (striking superseding order of conditions where parties did not rely on it and appeal did not turn on it because local bylaw was stricter than WPA). A conservation commission is not an "agency" within the meaning of Chapter 30A. See Garrity v. Conservation Comm'n of Hingham, 462 Mass. 779, 791 (2012) (noting that commission's decisions are not subject to judicial review under Chapter 30A). However, Superior Court Standing Order 1‑96 makes the procedures of G.L.c. 30A, ' 14(6) available in all administrative proceedings. That statutory provision permits a motion to the court for leave to present additional evidence to the administrative agency. It does not appear
-15-
to apply here, where Boston seeks to have the SOC considered directly by the court and not by the Commission in the first instance.
     Boston cites no authority for the proposition that the Court can take judicial notice of the SOC. Although judicial review of a final agency decision is confined to the administrative record, there is an exception when the court's jurisdiction is called into question. Manguriu v. Lynch, 794 F.3d 119, 120 (1st Cir. 2015). The court can look outside the administrative record when there is a colorable claim that some extrinsic action has rendered the case moot. Id. at 121. The court can take judicial notice of and consider a different agency determination for the purpose of resolving a claim of mootness. Id.
     Here, the SOC is material to the resolution of the parties' cross‑motions for judgment on the pleadings because if the Ordinance is no more protective than the WPA, the SOC controls the Project, rendering certiorari review moot. Accordingly, this Court will consider the SOC despite the fact that it was not entered into the administrative record. See id. See also Williams  Bros., Inc. of Marshfield v. Conservation Comm'n of Carver, 2012 WL 2135507 at *2 n.4 (noting that although record did not include documents from DEP process, the DEP superseding order of conditions is a matter of which the judge should have been informed).
Comparison of WPA and Ordinance 

     The Commission emphasizes that the Ordinance protects not only the wetlands values set forth in the WPA but also adds erosion, sedimentation, recreation, and aesthetics as protected values. See Quincy Wetlands Protection Ordinance ' 18.08.010. Cf. 310 Code Mass. Regs. ' 10.01(2). See also T.D.J. Develop. Corp. v. Conservation Comm'n of N. Andover, 36 Mass. App. Ct. at 127 (bylaw was more stringent where it protected additional interests of erosion control, sedimentation control, and recreation). However, the Commission's decisions are
-16-
devoid of any mention of protecting the wetlands values of erosion, sedimentation, recreation, or aesthetics. Rather, the decisions are premised on protection of the WPA values of water pollution, fisheries, wildlife habitat, and shellfish habitat. The fact that a local by‑law generally provides a more stringent regulatory scheme is not determinative; rather, the court must focus on the specific provisions of the bylaw on which the commission relied for its decision. Healer v. Department of Envt'l Prot., 73 Mass. App. Ct. at 719; T.D.J. Develop. Corp. v. Conservation Comm'n of N. Andover, 36 Mass. App. Ct. 124, 126, rev. den., 418 Mass. 1103 (1994). Accordingly, the fact that the Ordinance is more stringent than the WPA with respect to the values protected does not preclude the SOC from controlling the Project.
     The Commission further emphasizes that the Ordinance authorizes it to deny a permit "for failure to submit necessary information and plans requested by the commission." Quincy Wetlands Protection Ordinance ' 18.08.070. The Commission's denial of an order of conditions for the Project rested heavily on this authority, and the Commission specifically cited Boston's failure to provide adequate information about the condition of the piers, the necessary repair and replacement of the piers, the impact from cofferdams during repairs, adequate mitigation measures with respect to future pier repairs, the bedrock fault along the Bridge footprint, the ferry alternative, a stormwater pollution protection plan, and necessary repairs to Moon Island Road. The WPA regulations provide: "If the conservation commission finds that the information submitted by the applicant is not sufficient to describe the site, the work, or the effects of the work on the interests identified in M.G.L.c. 131, ' 40, it may issue an Order prohibiting the work." 310 Code Mass. Regs. ' 10.05(6)8. There does not appear to be any substantive difference between this provision and the Ordinance. Indeed, DEP requested and received additional information from Boston before permitting the Project to proceed under the
-17-
     WPA. Accordingly, the Commission's reliance on the provisions of the Ordinance relating to failure to submit necessary information does not preclude the SOC from controlling the Project. 
Grounds for Denial Preempted by SOC 

     The Commission denied the Project primarily because Boston did not fully quantify the adverse impacts to land under the ocean and land containing shellfish from the repair and replacement of the concrete piers, and failed to provide sufficient mitigation to meet performance standards. In particular, the Commission was concerned about the impact from the use of cofferdams to conduct future repair or replacement of the piers. The Ordinance does not define the resource areas of land under the ocean and land containing shellfish more protectively than the WPA. Cf. Parkview Elec. Trust, LLC v. Conservation Comm'n of Winchester, 88 Mass. App. Ct. 833, 836 (2016) (bylaw was more protective where it used more stringent definition of land subject to flooding). Instead, the Ordinance incorporates by reference the definitions of the WPA and its implementing regulations.
Nor does the Ordinance establish any substantive standards to protect wetlands resources. Cf. Hobbs Brook Farm Prop. Co. Ltd. P' ship v. Conservation Comm'n of Lincoln, 65 Mass. App. Ct. 142, 150‑151 (2005), rev. den., 446 Mass. 1104 (2006) (bylaw was more stringent where it created a presumption of adverse impact within 50 feet of river); FIC Homes of Blackstone, Inc. v. Conservation Comm'n of Blackstone, 41 Mass. App. Ct. at 687 (bylaw was more stringent where it required 100 foot wetlands setback). Indeed, in its decisions, the Commission cited to the WPA performance standards set forth at 310 Code Mass. Regs. '' 10.25(6), 10.34(4) and 10.35(3). Accordingly, the pier‑related aspects of the Commission's decision are preempted by the SOC, in which DEP expressly determined that the Project meets
-18-
the performance standards of the WPA for the affected wetlands resources in both Quincy and Boston, and minimizes impacts to coastal wetlands.
     The Commission further denied the Project based on Boston's failure to provide a draft stormwater pollution prevention plan and long‑term operations and maintenance plan for stormwater. However, the Ordinance does not establish any independent substantive standards with respect to stormwater. Accordingly, this aspect of the Commission's decision also is preempted by the SOC, in which DEP expressly found that the Project will provide stormwater treatment to the maximum extent practicable, as required for a redevelopment project under the WPA. Because the majority of the Commission's decisions rested on provisions of the Ordinance that are no more restrictive than the WPA, the parties' cross‑motions for judgment on pleadings with respect to Boston's claims for certiorari review are largely moot.
Cumulative Impact 
     Nonetheless, the Commission emphasizes that the Ordinance, unlike the WPA, expressly authorizes it to review proposed work for the cumulative impact on wetlands resource areas. The Ordinance authorizes the Commission to deny a permit if it finds that the proposed activities "are likely to have a significant or cumulatively adverse effect upon the wetlands values protected by this chapter." Quincy Wetlands Protection Ordinance ' 18.08.070 (emphasis added). In addition, the Ordinance places the burden on the applicant to prove that the proposed work "will not have unacceptable significant or cumulatively adverse effect upon the wetlands values protected by this chapter." Quincy Wetlands Protection Ordinance ' 18.08.120 (emphasis added). The WPA and implementing regulations do not expressly authorize the denial of an order of conditions based on concern for the cumulative environmental impact of the proposed work. Accordingly, it appears that the Ordinance is more protective than the WPA in this limited
-19-

respect. See Cave Corp. v. Conservation Comm'n of Attleboro, 91 Mass. App. Ct. 767, 772 (2017) (bylaw was more restrictive where it directly regulated vernal pools, prohibited all work in 25 foot buffer zone, and required commission to consider cumulative impacts from past activities and foreseeable future activities). To the extent that the Commission's denial rested on its authority to consider the cumulative impacts of the Project, it is not preempted by the SOC.[2] This Court therefore will address the parties' cross‑motions for judgment on the pleadings with respect to the aspects of the Commission's denial that rest on this provision of the Ordinance.
     Certiorari review is limited to a determination of whether the conservation commission's decision is supported by substantial evidence in the administrative record and whether the commission's action was arbitrary and capricious or based on an error of law. Detain v. Conservation Comm'n of Falmouth, 93 Mass. App. Ct. at 734. Substantial evidence must take into account whatever in the record fairly detracts from its weight, and a conservation commission's decision is not supported by substantial evidence if the record points to no appreciable probability of the conclusion or to an overwhelming probability to the contrary. Rodgers v. Conservation Comm'n of Barnstable, 67 Mass. App. Ct. 200, 205‑206 (2006).
A decision is arbitrary and capricious if there is no ground which reasonable persons might deem proper to support it. Garrity v. Conservation Comm'n of Hingham, 462 Mass. at
--------------------
     [2]Boston argues that the authority to consider cumulative impact is not more protective than the WPA, citing two decisions in which the Appeals Court concluded that local bylaws were preempted by superseding orders of conditions. Boston has submitted copies of the bylaws at issue in those two cases to show that they allowed consideration of cumulative impact. However, neither Appeals Court decision mentions cumulative impact, and it does not appear that cumulative impact was argued as a basis for deeming the local bylaw more protective than the WPA. See Healer v. Department of Envt'l Prot., 73 Mass. App. Ct. at 719 (concluding that commission denied project based on terms of WPA, not specifics of more rigorous bylaw); DeGrace v. Conservation Comm'n of Harwich, 31 Mass. App. Ct. at 136 (concluding that commission denied project based on adopted definitions of WPA, not more stringent local controls). Accordingly, the cited decisions are not dispositive of whether consideration of cumulative impact renders a bylaw more stringent than the WPA.
-20-
792. See also Fafard v. Conservation Comm'n of Reading, 41 Mass. App. Ct. 565, 568 (1996) (court examines whether decision was authorized by governing law in light of the facts). In addition, a decision is arbitrary and capricious if the commission acts for reasons that are extraneous to the prescriptions of the regulatory scheme, or devised for the occasion rather than of uniform applicability. Fieldstone Meadows Develop. Corp. v. Conservation Comm'n of Andover, 62 Mass. App. Ct. 265, 268 (2004); Fafard v. Conservation Comm'n of Reading, 41 Mass. App. Ct. at 568. The applicant appealing the decision bears the burden of proving that the commission acted arbitrarily. Garrity v. Conservation Comm'n of Hingham, 462 Mass. at 792.

     The sole aspect of the Commission's decision that expressly relies on the cumulative impact of the Project on wetlands values is the determination that Boston "refused to provide information on the wetland impacts from the needed repairs to Moon Island Road, the access to the Long Island Bridge. As a result, the Commission was unable to assess the cumulative wetlands impacts as it is required to do under the Ordinance." The Ordinance states that an NOI "shall include such information and plans as are deemed necessary by the commission to describe proposed activities and their effects on the environment." Quincy Wetlands Protection Ordinance ' 18.08.040 (emphasis added). Moreover, the Ordinance requires the Commission to deny or grant a permit after determining the environmental impact of "the activities which are the subject of the application." Quincy Wetlands Protection Ordinance ' 18.08.070 (emphasis added). Boston's NOI does not propose any repairs or other work on Moon Island Road and that road is not part of the application. Thus, it was arbitrary and capricious for the Commission to deny the Project based on inadequate information about potential repairs to Moon Island Road. Cf. Cave Corp. v. Conservation Comm'n of Attleboro, 91 Mass. App. Ct. at 773 (where ordinance authorized commission to consider cumulative adverse effects resulting from past
-21-
projects and foreseeable future activities, and NOI to extend roadway described intended creation and development of subdivision, commission could consider cumulative impact of subdivision on wetlands). The Commission's September 25, 2018 decision, as supplemented by its September 4, 2019 decision, cannot stand.
     Two other aspects of the Commission's denial might be viewed as implicitly falling within its authority to consider the cumulative impact of the Project. The Commission's decision notes that Boston failed to consider alternative methods of access, such as ferry access, that might have a lesser environmental impact than the Bridge. However, nothing in the Ordinance authorizes the Commission to require an alternatives analysis. Cf. Hobbs Brook Farm  Prop. Co. Ltd. P'ship v. Conservation Comm'n of Lincoln, 65 Mass. App. Ct. at 145 (local bylaw required applicant to prove that there was no feasible alternative to proposed project with less adverse effect on wetlands). Moreover, MEPA review is the mechanism which assesses the comparative environmental impact of alternative projects. See G.L.c. 30, ' 62B (environmental impact report must describe reasonable alternatives to proposed projects and their environmental consequences). A requirement that Boston provide detailed information about the ferry alternative does not appear to involve the cumulative impact of the Bridge and falls outside the prescriptions of the WPA and Ordinance. Denial of the Project based on the failure to provide this information therefore was arbitrary and capricious. Cf. Fafard v. Conservation Comm'n of Reading, 41 Mass. App. Ct. at 570 (where bylaw did not regulate activity in buffer zone, commission acted arbitrarily in denying permit based on concerns about potential or secondary environmental impact in that zone).
     Finally, the Commission's emphasis on the potential future failure of the concrete piers might be viewed as falling within a cumulative impact analysis, insofar as the Commission
-22-

expressed concern about the environmental impact of repairs that might be necessary at a later date. However, concern about prospective ordinance violations or future permitting requests are not a legally tenable ground for denying a submission that on its face complies with applicable law. Id. at 571 (noting that the enforcement provisions of WPA and local bylaws provide an adequate remedy for future violations); Wallstreet Develop. Corp. v. Conservation Comm'n of the Town of Hopkinton, 2004 WL 859046 at *5 (Mass. Super. Ct.) (Hines, J.) (concluding that concern with future permitting requests is not legitimate ground for denying permit). Thus, it was arbitrary and capricious for the Commission to deny the Project based on speculative concerns about potential impacts caused by future events, particularly given its focus on the use of cofferdams, which are not part of the Project.
     Because the Commission acted arbitrarily and capriciously with respect to the limited basis for its denial that rests on the Ordinance and is not preempted by the SOC, its September 25, 2018 decision, as supplemented by its September 4, 2019 decision, cannot stand.
II.         DECLARATORY JUDGMENT CLAIMS
Count IV
     Count IV of Boston's complaint seeks a declaratory judgment pursuant to Chapter 231A that the Commission's denial of an order of conditions effects a taking of property in violation of art. 10 of the Massachusetts Declaration of Rights and the Fifth and Fourteenth Amendments to the United States Constitution. Although Boston does not move for judgment on the pleadings on this Count, the Commission does.
-23-
     A defendant's motion for judgment on the pleadings is a challenge to the legal sufficiency of the complaint and is in effect a Rule 12(b)(6) motion that argues that the pleadings fail to state a claim upon which relief can be granted. Welch v, Sudbury Youth Soccer Ass'n, Inc., 453 Mass. 352, 353 (2009). To survive such a motion, a complaint must contain factual allegations which, if true, raise a right to relief above the speculative level. Golchin v. Liberty  Mut. Ins. Co., 460 Mass. 222, 223 (2011). The plaintiff's allegations must be more than mere labels and conclusions and must plausibly suggest, not merely be consistent with, an entitlement to relief. Coghlin Elec. Contractors, Inc. v. Gilbane Bldg. Co., 472 Mass. 549, 553 (2015).
     Count IV alleges that the Commission's denial of an order of conditions for the Project effects a taking because the Bridge is the only access roadway to Long Island, there is no other form of reasonable access for individuals, equipment and emergency vehicles, and the denial of the Project deprives Boston of all economically beneficial use of the seventeen public health facilities on the island. A municipality's enforcement of land use regulations may constitute an unconstitutional taking of property if the regulations bear no reasonable relation to a legitimate State purpose, or their application deprives the property owner of all economically beneficial use of his land, or interferes with his reasonable investment‑backed expectations. Gove v. Zoning Bd. of App. of Chatham, 444 Mass. 754, 760‑762 (2005); Smyth v. Conservation Comm'n of Falmouth, 94 Mass. App. Ct. 790, 795, rev. den., 482 Mass. 1102, cert. den., 140 S.Ct. 667 (2019). Assuming the facts alleged in Count IV to be true, as this Court must, Count IV plausibly alleges a claim for a taking. Accordingly, the Commission's motion for judgment on the pleadings must be denied.[3]
--------------------
     [3]As the Commission points out, Boston seeks only a declaratory judgment in Count IV, not compensation for the alleged taking of property. Boston presumably will not pursue this claim following this Court's annulment of the Commission's decisions.

-24-
Count V
     Count V of Boston's complaint seeks a declaratory judgment pursuant to Chapter 231A that the Commission's denial of an order of conditions is unlawful because it conflicts with the Home Rule Amendment and General Laws Chapter 43B, the Home Rule Procedures Act. Count V alleges that Chapter 480 of the Acts of 1949 authorized Boston to construct a bridge between Long Island and Moon Island, and the Commission's decision frustrates Boston's ability to exercise its statutory authority to build the Bridge.
     Boston moves for judgment on the pleadings on Count V, characterizing it as a claim that the Commission's decisions are preempted by the SOC. However, the allegations of Count V do not mention the DEP superseding order and the true nature of this claim is unclear to the Court. Accordingly, it will take no action at this time with respect to Count V.
ORDER
     For the foregoing reasons, it is hereby ORDERED that the City of Boston's Partial Motion for Judgment on the Pleadings be ALLOWED and the Defendants' Cross‑Motion for Judgment on the Pleadings be DENIED. The Quincy Conservation Commission's September 25, 2018 decision, as supplemented by its September 4, 2019 decision, is largely preempted by DEP's June 6, 2019 Superseding Order of Conditions; however, to the limited extent that the Commission relied on the more protective terms of the Quincy Wetlands Protection Ordinance
its decision is ANNULLED.
Superior Court
/s/Gregg J. Pasquale, Justice of the Superior Court
@December, 2020
-25-
xxz